# GORANSSON, Appellant, v. RITER-CONLEY MANUFACTURING COMPANY.

### Division One, February 15, 1905.

1. **MASTER AND SERVANT: Risks: Degrees.** All businesses are not equally hazardous, and the care required of the master to furnish his servant reasonably safe tools and appliances with which to work, is measured, in a great degree, by the nature of the business and the liability to accident or injury resulting from it.

2. ———: ———: **Causal Connection.** In a suit against the master for negligence in furnishing his servant defective appliances with which to work, it is necessary to allege and prove a causal connection between the injury and the negligence of the master.

3. ———: ———: ———: **Corollary of Rule: Several Causes.** The corollary of this rule which requires a causal connection to be alleged and proven between the injury of the servant and the negligence of the master, is that if the accident might have resulted from more than one cause, for one of which the master is liable and for the other of which he is not, it is necessary for the servant to prove that the injury arose from the cause for which the master is liable. Neither the jury nor the court can speculate or guess which cause produced the injury.

4. ———: ———: ———: ———: ———: **Three Causes: Iron Pin.** Plaintiff, an experienced structural iron worker, was employed in putting in rivets in the uprights of a gas reservoir, and where the holes were not large enough the course of the business was to drive in a driving lathe-turned pin by striking it with a maul, and as plaintiff struck such driving pin a sliver flew off and struck him in the eye, destroying its sight. Slivers were liable to fly off from three causes: first, when the pin was too highly tempered, in which case the master would be liable; second, if the workman hit the pin a slanting blow, in which case the master would not be liable; third, if there was a latent defect in the pin, in which case the master would not be liable. *Held,* that it was incumbent on plaintiff to show that the accident was due to the fact that the pin was too highly tempered, and there being a total failure of such proof, the plaintiff was properly nonsuited.

5. ———: **Evidence**: Connection. Where the defective appliance which it is alleged was negligently furnished to plaintiff was thrown away at the time of the accident, testimony that a fellow workman had protested a month before that like appliances made of similar material were defective and dangerous, is not competent if each appliance was separately treated and subjected to a separate test, for there is then no proper connection shown between the particular negligence alleged and the general negligence which such testimony might tend to show existed the month previous.

Appeal from St. Louis City Circuit Court.—*Hon. H. D. Wood*, Judge.

AFFIRMED.

*Myron Westover* and *F. C. Sharp* for appellant.

(1) The master must furnish reasonably safe tools, and keep them safe. The servant, relying on this rule, has a right to presume the master has discharged his duty toward him. If the master furnishes a tool which he knows, or, by the exercise of reasonable care, might know, is defective, or not reasonably safe, he is liable to the servant for any injury resulting from such defect. Duerst v. Stamping Co., 163 Mo. 607; Pauck v. St. Louis Dressed Beef Co., 159 Mo. 467; Franklin v. Railroad, 97 Mo. App. 480; Swadley v. Railroad, 118 Mo. 268. (2) In passing upon a demurrer to the evidence every fact and every reasonable inference of fact is admitted by the demurrer to be true. Pauck v. St. Louis Dressed Beef Co., 159 Mo. 475; Connelly v. St. Joseph Press Ptg. Co., 166 Mo. 463.

*Seddon & Holland* for respondent.

The court ruled correctly in giving the peremptory instruction asked by respondent at the close of plaintiff's evidence in chief for the following reasons: (1) There was no evidence that the chip which struck plaintiff came from the driftpin which he was using.

(2)   There was no evidence that the chip flew from the driftpin on account of any defect therein which was discoverable by defendant.   In order to recover, it was incumbent upon appellant to prove that the chip flew from the pin on account of a defect that was discoverable by the exercise of ordinary care, and not on account of a latent defect.   Railroad v. Nelms, 83 Ga. 70; Wood on Law of Master and Servant, secs. 368 and 382; Thompson on Negligence, p. 1053, sec. 48; Epperson v. Tel. Cable Co., 50 S. W. 795; Searles v. Railroad, 101 N. Y. 661; Smith v. Bank, 99 Mass. 611; Dobbins v. O'Brien, 119 N. Y. 193; Pierce v. Kile, 80 Fed. 868; Brownfield v. Railroad, 5 Am. Neg. Rep. 33; Kepner v. Traction Co., 183 Pa. St. 24; Oglesby v. Railroad, 177 Mo. 272.   (3)   The court ruled correctly in striking out the testimony of McKenzie in reference to several pins that went to pieces in June. There was no evidence that the chip flew from the driftpin on account of any discoverable defect in the driftpin, and the fact that a few driftpins, a month before, had gone to pieces, does not tend to establish that the chip which flew on the occasion of the accident to appellant was on account of the same reason, because no identity of condition was shown between the pin used by appellant and the other pins referred to.   On the contrary, the evidence showed that most of the pins worked in normal fashion.   Franklin v. Railroad, 97 Mo. App. 473; Railroad v. Nelms, 83 Ga. 70.

MARSHALL, J.—This is an action for ten thousand dollars damages, for personal injuries sustained by plaintiff, on the tenth of July, 1901, while in the employ of the defendant.   The trial court sustained a demurrer to the evidence, at the close of the plaintiff's case, the plaintiff took a nonsuit, with leave, and after an unsuccessful motion to set the same aside, appealed to this court.

The petition alleges the relation of master and

servant, and that the defendant was engaged in the erection of a gas reservoir, at the corner of Chouteau and Newstead avenues in St. Louis, and that the defendant employed the plaintiff to rivet columns therein. The negligence alleged is "that the tools and appliances furnished to him by defendant, for his use in his said employment, were defective, as defendant well knew or might have known, by the exercise of reasonable care and caution;" that "while he was using said tools and appliances to drive a drifting pin, in performing said duties, a piece of said pin, by reason of the defective condition thereof, flew and struck the plaintiff in his left eye, causing the total destruction of the sight thereof."

The answer is a general denial, with a plea of contributory negligence, and a plea of assumption of risk.

The case made by the plaintiff is this:

The plaintiff was forty-four years of age. He was a structural iron worker by trade, and had been in that business over ten years. Two days before the accident, he was employed by defendant's foreman, and set to work riveting the frame work of the reservoir. The foreman showed him where to work and told him where he would find the tools. He was working on a platform about thirty-five feet above the ground, with the riveting gang, whose duties were to join steel uprights of the frame work together, by the insertion and fastening of rivets. One of the men would heat the rivets, another would insert it, while heated, in the holes of the pieces to be connected, and hold it in place with his hammer, while another would fasten it. At times the holes in the iron work would not correspond, and the rivet could not be inserted. In such cases it was necessary to straighten out the holes, which was done by inserting and driving through a "drifting pin," by striking it with a six pound hammer or maul. The drifting pins were made of steel, and

were thirteen-sixteenths of an inch in diameter, and from five to seven inches long, barrel-shaped, the largest being one-sixteenth of an inch larger than the rivet, and the same size as the hole through which they were to be driven. The plaintiff was driving a drifting pin with a maul. The pin, was new and had not been used before. It was a turned or lathe-made pin, and not a hand-made pin. When the plaintiff hit the pin, a small sliver, about the size of a grain of wheat, chipped off and hit him in the eye. The other men caught the plaintiff to keep him from falling off the scaffold, and one of the men examined the pin and found that two slivers about the size of grains of wheat, had chipped off. The man then threw the pin away. There was, therefore, no opportunity afforded of afterwards testing it.

The defendant used a great many such drifting pins in the doing of this work. The pins were made from bars of steel, purchased by defendant from the Firth-Sterling Steel Company, of Pittsburg, Pennsylvania, a first-class concern. They were made by that company out of what is called "Silver Star" steel, which is the best grade of steel that is manufactured for making drifting pins. They were three and a half temper, which means seventy-five one-hundredths of a per cent carbon, which is the mildest temper made for drifting pins. They are made softer in temper so that they will not chip, but the end that is struck with a hammer will crush or batter down. They were furnished to the defendant in round bars, ten or twelve feet long. When defendant received such bars, they were sent into the tool shop, where they were cut into pieces, six to eight inches long, by an expert tool manufacturer. The pieces were then turned with a lathe into drifting pins of the size and shape described. The pins were then tempered by being heated, and while hot, dipped in oil, which made them tougher, but not as hard as if dipped in water. The more highly tem-

pered they were, the more brittle they were. Such pins may be turned with a lathe or forged by hand. Either method is proper, but for work like this, where the rivets must fit the holes so tight as to prevent the escape of gas, turning with a lathe is considered the best, for it makes a smoother hole. If the steel is very highly tempered, it will be easily detected, because the lathe won't work it. After the pins are made, they are placed in a box, where the workmen go and help themselves. It also appeared that the temper of the pins could be ascertained by trying them with a file or hammer.

Some time in June, preceding the accident, one of the men, who was a witness for the plaintiff, used several pins and they chipped, and he said to the defendant's foreman, "These pins are awful bad; they are dangerous to work with." The testimony was first admitted over the defendant's objection, but, afterwards, on defendant's motion, it was stricken out, on the ground that it had no tendency to prove that the pin the plaintiff used was defective, and this is assigned as error in this case. Afterwards the said man, while working with the plaintiff, took some pins from the box that he thought were too highly tempered, and heated them and drew the temper out of them to prevent accident, and some of the pins he threw away. The witness did not see the pin that the plaintiff was using, and so could not say whether it was one of the pins he had drawn the temper out of or not.

It also appeared that pins may chip so that slivers will fly off from them, from three causes, to-wit: first, because they are too highly tempered; second, when they are struck a slanting blow with the maul; and, third, because there is a latent defect of some sort in them.

It also appeared from the testimony of the defendant's tool-maker, that he did not temper forged

Vol 186 mo—20

driftpins, and that in the shop they used forged drift-pins and not turned pins, but it also appeared that forged pins were rougher than lathe-turned pins, and that the latter were better for gas reservoirs because there was less liability of leaks.

It further appeared that when a driftpin was not tempered too highly, the end would mash or crush where it had been hit with a hammer, and that a great many of those used by the defendant had done so, and that after they had done so, the men would take a hammer and knock off the mashed edges, before again using them.

Upon this showing the trial court nonsuited the plaintiff, and the only question here involved is whether or not this ruling was correct.

## I.

It is the duty of a master to furnish his servant a reasonably safe place and reasonably safe tools and appliances in which and with which to do his work. A failure to do so constitutes actionable negligence. [Minnier v. Railroad, 167 Mo. l. c. 112; Holmes v. Brandenbaugh, 172 Mo. 53; Curtis v. McNair, 173 Mo. 270; Fisher v. Lead Co., 156 Mo. 479.]

The qualifications to this rule need not be here repeated, for they are not involved in this case. The master, however, is not an insurer of the safety of the place or tools and appliances. His duty is to exercise ordinary care, and his liability arises out of his negligence in not exercising such care. The servant, on the other hand, assumes the risks ordinarily and usually incident to the employment, and the wages he receives are in part compensation for assuming such risks. The qualifications to this general rule need not be repeated here. Necessarily, all business or employments are not equally hazardous, and the care required of the master is measured, in a great degree, by the

nature of the business and the liability of accident or injury resulting from it.

It is, therefore, a rule of universal law that in suits of this character it is necessary for the plaintiff to allege and prove a causal connection between the injury and the negligence of the master. The corollary of this rule is that if the accident might have resulted from more than one cause, for one of which the master is liable and for the other he is not liable, it is necessary for the plaintiff to prove, in the first instance, that the injury arose from the cause for which the master is liable, for it is not the province of a court or jury to speculate or guess from which cause the accident happened. [Railroad v. Nelms, 83 Ga. 70; Searles v. Railroad, 101 N. Y. 661; Dobbins v. Brown, 119 N. Y. l. c. 193; Peirce v. Kile, 80 Fed. l. c. 867; Mining Co. v. Kitts, 42 Mich. l. c. 37; Priest v. Nichols, 116 Mass. 401; Epperson v. Telegraph Cable Co., 155 Mo. 346; Wood on Law Master and Servant, sec. 382.]

It only remains to apply these principles and rules of law to the case made by the plaintiff.

Here the defendant furnished the drifting pins for the plaintiff to work with. The steel from which they were made was purchased from a manufacturer of good standing, and the steel was the best that is manufactured for such use, and was of a temper of the proper character. The steel came to the defendant in round bars, ten or twelve feet long. The expert toolmaker of the defendant cut the bars into pieces six or eight inches long, and then with a lathe turned the pieces into pins, which were round, largest in the middle, and pointed or nearly so at both ends. He then tempered the pins by heating them and dipping them in oil. There is no pretense that this was not a proper method of doing so. After he made them he put them in a box, where the workmen could get them. The defendant used a great many such pins in its business, and the pins wore out of course. Necessarily all the

pins were not made at the same time, and, as is usual with all artificial or manufactured articles, the temper of all is not uniform, for the temper depends upon the amount of heat they were subjected to when they were dipped into the oil, the greater the heat the more brittle and liable to chip they are. The men themselves were in the habit, when they thought the pin too highly tempered, to heat them and "draw the temper," as they called it, before using them. The temper could be ascertained by testing the pin with a file or by striking it with a hammer before using it, and this means of testing it was open equally to the plaintiff and the defendant, and was so simple a process that any one of experience in such work could do so, and the plaintiff had had over ten years' experience as a structural iron worker.

But all the pins were susceptible to latent flaws or water cracks from excessive heating, and such flaws could not be detected by any test, and appeared only during the use of the pin, when a sliver would fly off from the weak point of the pin which covered the crack. Slivers were liable to fly off from the pin when it was too highly tempered, or when the workman hit the pin a slanting and not a square blow with the hammer, or when there was a flaw or latent defect in the pin.

It, therefore, appears that the master would be liable if the sliver was caused to fly off by reason of the pin having been too highly tempered, but that he would not be liable if it was caused by the act of the workman himself in striking the pin a slanting blow, or if there was a latent defect in the pin.

It, therefore, devolved upon the plaintiff in this case to show that the sliver which flew off from the pin and injured him, did so because the pin was too highly tempered. Otherwise, the master is not liable. And unless the plaintiff did so show by some substantial testimony, he did not make out a prima facie case for the jury. The plaintiff appreciated this, for he at-

tempted to so prove. As the pin itself had been thrown away by a fellow workman of the plaintiff, the plaintiff attempted to make the proof so required by showing that about a month before the accident the fellow workman was working with some pins and that slivers flew off from them. He told defendant's foreman that the pins were "awfully bad" and were "dangerous to work with." At first the court admitted this testimony, but afterwards struck it out, because no connection was shown between those pins and the pin that the plaintiff was using. This ruling was evidently made because it later appeared that while all the pins are made from steel that defendant purchased from said Pittsburg manufacturer, each pin was separately turned and separately tempered, and because it appeared that the defendant had used a great number of such pins that were made out of the same character of steel and by the same expert tool-maker, and they showed, by the end that was struck with the hammer crushing over, that they were properly tempered; and, further, because it appeared that the fellow workman who so testified also said that while working with the plaintiff he drew the temper from some of the pins and threw the others away, and it did not appear whether or not the pin the plaintiff was using was one that such witness had attempted to draw the temper out of. To draw the temper it was necessary to heat the pin and dip it in oil or water, so as to reduce, but not entirely destroy, its temper.

This condition and this testimony amply justified the trial court in striking out the testimony, for it would have left the jury to supply by conjecture, a connection of condition between the pins that the witness used a month before the accident and the pin that plaintiff was using; and in addition it involved a further speculation as to whether the pin that was made by the expert tool-maker, had been overheated and too highly tempered by the act of the witness in attempt-

ing to reduce its temper, which act the master had no notice of and had not authorized and hence was not responsible for.

This left the plaintiff's case without any testimony whatever from which the jury would be authorized to find the fact to be that the pin the plaintiff was using was too highly tempered, and that the injury resulted from that cause and not from the character of the blow the plaintiff gave it or from a flaw in the pin. And, therefore, there was no causal connection shown between the accident and the negligence charged.

In this respect this case differs essentially from the cases of Duerst v. Stamping Co., 163 Mo. 607, and Franklin v. Railroad, 97 Mo. App. l. c. 480. In both of those cases the actual defects in the tool furnished were shown by evidence sufficient to take the cases to the jury. The Duerst case was reversed solely because the court refused to instruct the jury that if the accident was caused by the plaintiff striking the mandrel instead of the wire handle with the hammer, the defendant was not liable. So here the testimony wholly fails to show that the plaintiff struck the pin a square blow instead of a slanting blow, and it was necessary for the plaintiff to so show in order to exclude the hypothesis that the sliver flew off from the blow and to show that it flew off because the pin was too highly tempered.

Upon the whole case made there was no error in the ruling of the trial court, and, therefore, the judgment is affirmed. All concur.