WILLIAM DUNPHY, Respondent, v. ST. JOSEPH STOCK YARDS COMPANY, Appellant.

Kansas City Court of Appeals, May 7, 1906.

1. **TRIAL AND APPELLATE PRACTICE: Demurrer to Evidence: Inferences: Conflicts.** In passing on a demurrer to the evidence every reasonable inference from the facts and evidence should be indulged in favor of the cause of action asserted; and conflicts and contradictions are for the jury to resolve and are settled by the verdict and cannot be noticed by the appellate court.

2. **NEGLIGENCE: Derailment: Demurrer to Evidence: Proximate Cause.** Evidence relating to the derailment of an engine is regarded as tending to show the existence of the defects alleged in the pleading, to wit: *First*, Light rails, light guardrail and

frog; *Second,* Loose guardrail; *Third,* Insufficiency of ties and deficient attachment of rails and frog; *Fourth,* Rotten ties: all tending to point out the track as the producing cause of the derailment.

3. ——: ——: ——: **Causal Connection.** The causal connection between a defective track and the derailment need not be shown by direct evidence but may be inferred from the facts and circumstances; and on the evidence the jury was not left to speculation as to which of the defects produced the result.

4. ——: **Proximate Cause: Different Causes.** Where there are two or more causes some attributable to the negligence of the defendant and others not so attributable, the jury should not be left to conjecture as to which produced the result, but the injured party must connect his damage with the negligent act of the defendant complained of. Whether when the injury may have resulted from one of two or more independent and unrelated negligent acts the injured party is required to plead and prove the act that produced the injury and not leave it to the jury to select among them, *quaere.*

5. ——: **Notice: Evidence.** Evidence relating to the defendant's notice of the alleged condition of its track where his engine was derailed is held sufficient to go to the jury.

6. **MASTER AND SERVANT: Contributory Negligence: Different Methods of Work.** Where a servant voluntarily chooses a more dangerous place or tools or chooses the more dangerous of two ways of performing his work and is injured thereby, he is guilty of contributory negligence.

7. **NEGLIGENCE: Contributory Negligence: Natural Result: Jury.** The result is not the true test of negligence in assuming a position in a dangerous business; ordinary prudence takes into consideration the natural and probable consequences of a given act and not such as are remote, speculative or merely possible; and a position assumed by a switchman in riding sideways on a buffer beam cannot be determined under the circumstances to be as a matter of law contributory negligence, but such question was for the jury.

8. **EVIDENCE: Judicial Notice: Inferences: Contradiction of Natural Law: Duty of Courts.** Courts will not stultify themselves by testimony or inferences therefrom that are opposed to all natural and reasonable probability, but should observe the utmost caution to avoid assuming knowledge of natural facts and laws that are beyond the scope of the common positive knowledge, and these rules are applied to a painless injury of the scrotum which afterwards became severe.

Appeal from ·Buchanan Circuit Court.—*Hon. Wm. K. Amick,* Judge.

AFFIRMED.

*Thos. F. Ryan* for appellant.

(1)   The demurrer prayed by the defendant at the close of the evidence should have been given.   First. Because there was no evidence whatever offered, tending to prove that the defendant had actual notice of the defect or insufficiency in the track that derailed the engine; or that a defect at that place had existed for such a length of time that the defendant, in the exercise of ordinary care, could have discovered it in time to have remedied it before the engine was derailed.   The cause of the engine leaving the rail was not shown with any certainty, but was left a matter of conjecture. How then could defendant have notice of a cause that rested in conjecture, long enough before the derailment to have repaired and remedied it?   Felhauser v. City, 178 Mo. 635; Nixon v. Railway, 141 Mo. 425; Porter v. Railway, 71 Mo. 77, 78; Thomas v. Railway, 109 Mo. 197-207. Second.   The demurrer should have been given because the plaintiff directly contributed to bring about his injury, by taking the position he assumed on the drawbar and riding thereon.   It was the position plaintiff occupied that defeated his recovery in each of those cases. Montgomery v. Railway, 109 Mo. App. 88; Chaney v. Railway, 176 Mo. 603; Jones v. Railway, 95 U. S. 439; Link v. Coal Co., 80 Mo. App. 380; Watson v. Coal Co., 52 Mo. App. 366; Zumalt v. Railway,175 Mo. 288; Straub v. Railway, 106 Mo. 92; Brown v. Byroads, 47 Ind. 435; Davis v. Railway, 159 Mo. 1; Smotherman v. Railway, 29 Mo. App. 267; Dickinson v. Railway, 103 Mo. App. 332; Meyers v. Railway, 103 Mo. App. 274; Morrison v. Railway, 27 Mo. App. 433; Moore v. Railway, 146 Mo. 581; Hudson v. Railway, 123 Mo. 445; Doerr v. Brewing Co.,

176 Mo. 556; Railway v. Sentemeyer, 92 Pa. St. 276; Sparks v. Railway, 31 Mo. App. 114; George v. Railway, 159 Mo. 339; Richardson v. Mesker, 171 Mo. 666. Third. The demurrer should have been given because the pretense that the dissolution or disintegration of plaintiff's testicle was caused by a bruise is supported by plaintiff's own testimony only, and in view of his own testimony that he did not know that his testicle had been injured for three hours after; that it did not interrupt him in working; that he worked right along for three days after the derailment; that it was not black and blue, but only red and inflamed, is so contrary to all human experience and to the medical testimony in the record, that neither courts nor juries are bound to stultify themselves by accepting the evidence as true. It was simply a physical impossibility, as the doctors say, for plaintiff to have received a bruise severe enough to cause the rotting of his testicle, and go right on working without knowing for three hours that his testicle had been disturbed. Nugent v. Milling Co., 131 Mo. 253; Oglesby v. Railroad, 150 Mo. 188; Hook v. Railway, 162 Mo. 580. Fourth. The only testimony tending to support the theory that it was produced by a bruise is that of plaintiff, which is so inconsistent and contradictory, and disputed on material points by so many witnesses that it is wholly untrustworthy. Smart v. City, 91 Mo. App. 586; Oglesby v. Railway, 177 Mo. 272; Epperson v. Railway, 155 Mo. 346; Smith v. Railway, 37 Mo. 295; Wood v. Railway, 51 Wis. 201; United States v. Ross, 92 U. S. 283; Goransson v. Manuf. Co., 176 Mo. 300. Fifth. The demurrer should have been given because there was no evidence to establish that the defendant had been guilty of negligence in respect to track No. 10 of Swift & Company's yard. The evidence utterly failed to show: 1. That the rails of the track were too light; 2. That the guardrail was too light; 3. That the frog was too light. 4. That the ties were rotten. 5. That the guardrail was loose before the

heavy engine left the track, and struck and climbed over the guardrail, or 6. That the derailment was caused by any defect or insufficiency in these respects. Trigg v. Land Co., 187 Mo. 227; Chandler v. Gas Co., 174 Mo. 321; Furber v. Railway, 185 Mo. 311; Howard v. Railway, 173 Mo. 524; Goransson v. Mfg. Co., 186 Mo. 300; Rubber Co. v. Water Co., 184 Mo. 678; Stoneman v. Railway, 58 Mo. 503; Goodwin v. Railway, 75 Mo. 76.

*H. M. Ramey, Jr.,* and *C. F. Strop* for respondent.

Submitted an argument.

JOHNSON, J.—Plaintiff recovered a judgment in the sum of $2,000 on account of personal injuries alleged to have been received while he was in the service of defendant and the case is here on defendant's appeal.

Defendant owns and operates stock yards at the live stock market in St. Joseph and in connection therewith owns and operates a terminal railroad yard which serves to connect the stock yards and adjacent packing plants with the various railroads that enter the city. This railroad yard was built by defendant and consists of many tracks and switches, which are used in the hauling of live stock to and from the pens, supplies to the stock yards and packing houses, and meat products from the latter concerns. A number of tracks connect the main yard with the packing plant of Swift & Co., and it is upon one of them, "track No. 10," that plaintiff claims to have been injured. Plaintiff was in the service of defendant as a switchman and at the time of the occurrence in question was one of the crew carried on switch engine "No. 3." This engine weighed about forty-five tons. It had an extension boiler, had no pony trucks in front of the drivers and carried no pilot. The front frame and buffer beam extended below and in front of the boiler end and rigidly suspended from the beam was a footboard one foot wide and long enough to extend

over the width of the track. The footboard was for the
use of the front brakeman when it became necessary for
him to ride on the engine. A handrail was attached
to the buffer beam at a sufficient height to enable the
brakeman, when standing on the footboard, to grasp it
with his hand and thus support and steady himself. A
drawbar projected from the middle of the buffer beam
out over the footboard and at its end was provided with
an adjustable coupling device. An iron pin running
perpendicularly through this coupler served as a hinge
for one of its movable parts. The head of this pin pro-
jected upward several inches, but behind it there was—
according to plaintiff's statement — sufficient room on
the top of the drawbar for a person to seat himself while
riding on the footboard.

Plaintiff was the front brakeman in his crew. An
order had been given for the engine to proceed some five
hundred feet to a point on Swift's track No. 10 and
couple to a car standing there. Plaintiff stepped on the
footboard, the proper place for him to ride, and seated
himself on the projecting drawbar to rest while approach-
ing the car. The engine, moving at the rate of about five
miles per hour, was derailed on track "No. 10" at a
switch frog, ran a few feet on the ties and stopped.
Plaintiff either was thrown or jumped from his position
to the ground and sustained no injury from leaving the
engine. He claims that the concussion from the derail-
ment produced the wounding of his scrotum by the hard
substance upon which he was sitting and this resulted
in the injury of which he complains.

The negligent acts of defendant, which plaintiff
avers were the producing cause of the injury, are em-
braced in these allegations of the petition, "that defend-
ant constructed that system of tracks in a negligent, im-
proper, unsafe and dangerous manner, in this, to-wit; the
ties used in the construction thereof were not sufficient in
number to properly and safely hold the number of rails
laid, were of insufficient size and strength to withstand

the strain of the traffic and support the engines and cars run over same, and were unsound; that the rails and frogs used in the construction thereof were of insufficient weight, width and thickness to withstand the strain of traffic and support the engines and cars run over same, and were insecurely spiked and fastened to the ties, and were not sufficiently braced at the curves in the tracks; that defendant negligently and carelessly permitted the rails, ties, guardrails and frogs of said tracks to get out of repair, and in a dangerous and unsafe condition in places; that the dangerous and unsafe condition of said rails, ties, guardrails and frogs and the negligent, careless, improper and unsafe and dangerous construction of said system of tracks was well known to defendant," etc; . . . . "that defendant negligently and carelessly attempted to run said engine . . . over one of said dangerous and unsafe places; that at said . . . place the rails were defective and unsound, were unsecurely spiked or fastened; the ties to which said rails were fastened were old and rotten; the guardrail was loose and warped and the frog was loose, bent and unsafe." Defendant is charged with actual or constructive knowledge of the existence of these conditions a sufficient time to have remedied them, had it exercised reasonable care.

Defendant asked, and the court refused it, an instruction in the nature of a demurrer to the evidence. It is argued by defendant with much earnestness and ability that this instruction should have been given and we will consider in their proper order the reasons advanced in support of this contention.

First, it is said that none of the specific acts of negligence charged in the petition is supported by proof. In looking at the case from the standpoint of a demurrer to the evidence, we will follow the well-recognized rule that requires us to draw every reasonable inference from the facts in evidence that may be indulged in favor of the cause of action asserted. There is a sharp conflict be-

tween the witnesses of the opposing parties and the evidence adduced by plaintiff in its bearing upon some important facts is not altogether harmonious, but such conflicts and contradictions were for the jury to resolve and, so far as we are concerned, are settled by the verdict in favor of plaintiff and now will not be noticed.

It appears from the evidence of plaintiff that the rails in use on the track where the derailment occurred and on the other tracks in the yard were of the same weight and were too light to carry properly the heavy traffic that passed over them. Trains of heavily ladened cars were frequently run over this track to and from the packing house. The frog where the engine left the track, made to fit rails of the size of those in use, was correspondingly light. The place in question was situated in a curve in the track and, without detailing the facts, it is sufficient to say it was shown that an insufficient number of ties was used and the rails were not properly spiked to insure the requisite stability. Further, it appears that the guardrail running parallel to the rail opposite the frog was light and after the accident found to be loose though still attached to the ties by the spikes. The function of this rail was to hold the wheels of engines and cars to the proper course during the passage over the frog. That this guardrail was not securely spiked and braced to withstand the strain imposed upon it is manifest, if credit is to be given to plaintiff's evidence.

Defendant argues that in view of the fact that this rail was crossed by the wheels of the engine in its derailment, the loosened condition afterwards discovered is to be attributed rather to that strain than to a previous condition, but the fact remains that from the causes stated the guardrail was inherently weak and insufficient for the purposes of its use and the influence exerted by this defect in producing the deflection of the engine wheels was a fact for the consideration of the triers of fact. Moreover, under other facts before us, it is but

118 App.—33

reasonable to infer that the rail had been loose for some time. There is evidence in the record tending to show that in the course of a few preceding weeks several derailments of engines had occurred at this very place. The wheels of these engines likewise crossed the guardrail and each must have had some effect towards the loosening of the rail. Under such circumstances, it is clear an issue of fact is raised.

In addition, it appears that some five or six ties at this place were so decayed as to be unfit for use. Defendant insists that as plaintiff on cross-examination was pressed into saying that he could see the ties were rotten from the track left in them by the engine wheels, the evidence must be disregarded because, first, the flanges of the wheels would indent sound ties and, second, the evidence relates only to ties that were ahead of the engine wheels when it left the track and whatever the condition of such ties may have been it could not have affected the security of the track at the place of derailment. We may concede that the engine's wheels would have left their mark in sound ties crossed by them, but the character of an indentation made in a hard, sound tie might and no doubt would noticeably differ from that made in one softened by decay, and we understand plaintiff to mean that the presence of the marks made by the wheels enabled him to discover the actual condition of the wood. Plaintiff's evidence does locate the six rotten ties in front of the place where the engine left the track, but under the same section of track —indeed, the guardrail, which was said to be seven feet long, had one end (that away from the approaching engine) resting on and attached to one of these ties and the other defective ties followed immediately beyond that end of the guardrail. Engines and cars approaching the guardrail and frog from the opposite direction had crossed these defective ties immediately before passing over the frog and it is reasonable to infer that the presence of so many rotten ties lessened the rigidity of that portion

of the track and thereby subjected to an unusual strain the guardrail and frog contiguous to it.

We, therefore, have before us substantial evidence tending to show the existence of these defects, each of which could have contributed to the production of an unsafe condition of the track at the place in question: first, light rails, guardrails, and frog; second, a loose guardrail; third, an insufficient number of ties and consequent deficient attachment of rails and frog; and fourth, rotten ties in the track immediately adjoining that occupied by the frog and guardrail.

But defendant urges, that should the existence of these defects be conceded plaintiff has yet fallen short of making out a case to the jury because; first, it is not shown that any of them was the proximate cause of the derailment and, second, in stopping with the presentation of a number of causes any one of which could have produced the result without showing which one of them in fact did produce it, plaintiff presented a state of facts that drove the jury into the field of conjecture and speculation to arbitrarily and capriciously make a selection from a number of causes without having any substantial foundation for the conclusion that the one chosen was the real cause of the derailment. Plaintiff's cause of action is grounded in negligence. He asserts that defendant was negligent in two respects, i. e., in the original construction of the track and in failing to maintain it in proper repair. He has specified in the petition the particular faults of which he complains and has produced evidence tending to show their existence. He has pleaded that these specific defects were the immediate cause of his injury. The burden he assumed, which the law will compel him to carry to the end, was twofold. It imposed upon him the task of proving an act of negligence charged in the petition and that such act was the direct cause of his injury. We have noted his performance of the first half of his task and it remains to be ascertained if he has fulfilled the remainder.

The facts in proof compel a reasonable mind to look to the track for the producing cause of the derailment. There was no defect in the engine and it was being run at slow speed and in a careful manner. Other engines had been derailed at the same place within a short period preceding this occurrence and no repairs of the track had been made. The loosened condition of the guardrail was sufficient to permit the engine to leave the track under the other conditions disclosed. No other cause for the derailment than the defective track is suggested, nor is one even conjecturable. Plaintiff is not required to show the necessary connection between the defective track and the result claimed from it by direct evidence. That fact may be inferred from other facts and circumstances and in our opinion is abundantly supported by those in evidence. We do not agree with the argument of defendant that the jury was compelled to resort to speculation in the selection of the proximate cause. All of the defects shown were so related as to lead to the conclusion that they interacted and co-operated together to produce a dangerously insecure and unsafe track. Each may be regarded as an ingredient entering into the composition of a dangerous whole. Each was the result—of the negligence of defendant, so that, in the end, we are confronted with a single proximate cause — an unsafe track that became unsafe solely through negligence.

We have carefully examined the authorities cited by defendant as applicable to the question under consideration and find nothing in them at variance with the views expressed. It may be said that when it appears that an injury may have resulted from one of two or more causes, some attributable to the negligence of the defendant and the others not, the jury should not be left to conjecture and if the plaintiff fails to connect his injury with the negligent cause he cannot be permitted to recover under the mere supposition that the negligent act of which he complains might or could have caused the injury (Trigg

v. Ozark Co., 187 Mo. 227; Goransson v. Mfg. Co., 186 Mo. 300) and, further, it may be conceded for argument (though not so decided) that, when it is shown that the injury may have resulted from one of two or more independent and unrelated negligent acts of the defendant, the plaintiff is required in his pleading and proof to point out the act that produced the injury and not leave it to the jury to make a speculative selection among them. But neither of these principles applies to a situation like to that before us where several defects have sprung from the same negligence — are of the same parentage — and have combined and co-operated in the production of a dangerous condition that becomes the proximate cause of injury.

Another point made by defendant is that there is no evidence to show that defendant had either actual or constructive knowledge of the defects in the road a sufficient length of time before the injury to have enabled it to remedy them by the exercise of reasonable care. The rails, guardrail and frog had been there from the building of the track. The jury, as we have shown, was justified in saying that the guardrail had been loosened and made unsafe either from the unusual strain imposed on it in consequence of the defective track supported by the decayed ties or as a result of the prior derailments shown. It is a fair inference to say that the loosened condition of the guardrail contributed to all of the derailments and therefore must have existed for more than a month before the injury to plaintiff. The rotting of wood is a slow process and it was for the jury to say whether a reasonably careful inspection of the ties would have disclosed their condition. This point also must be ruled against the defendant and we conclude this branch of the case with the observation that plaintiff adduced substantial evidence tending to show that the derailment of the engine was the direct result of the negligence charged:

But it is insisted that plaintiff himself was guilty,

in law, of negligence that directly contributed to his injury. The argument advanced is this: Had plaintiff contented himself with using the means provided for the carriage of the front brakeman, he would not have been injured. The means referred to are the footboard and handrail. Instead of doing this, he seated himself on the drawbar, an instrument not intended for such use, and thus voluntarily and unnecessarily placed himself in a dangerous situation.

There is some conflict even among witnesses for plaintiff relative to his position immediately before the derailment, but, adopting the facts most favorable to him, it appears that he was standing with one foot on the footboard, his buttock resting on the top surface of the drawbar behind the projecting head of the pin, and his other foot unsupported. In other words, he was sitting sidewise on the drawhead with one foot on the footboard to partially support his weight and with the head of the pin in front of his privates. When the front drivers left the track, the footboard dropped to the rails with a sudden jar and was bent upward and slided along the rails until the engine stopped. Plaintiff's scrotum was pinched either from being caught between movable and fixed parts of the coupler or from being violently pressed against his leg or body either by the surface of the drawbar or head of the pin. The projecting drawbar had the effect of bisecting the space that could be occupied by a person standing on the footboard and the surface of the drawbar afforded a convenient, inviting and relatively safe place to rest upon in the manner detailed. Plaintiff had no duty to perform while riding to the place where the coupling was to be made and it was a very natural thing for him to rest himself upon the drawbar and, unless we must say as a matter of law that his position certainly increased his risk of injury, the issue involved in his conduct is one of fact for the jury and not of law for the court.

Defendant endeavors to apply to the facts before us the principles stated in the following cases. [Montgomery v. Railway, 109 Mo. App. 88; Chaney v. Railway, 176 Mo. l. c. 603; Lenk v. Coal Co., 80 Mo. App. 375, 380; Watson v. Coal Co., 52 Mo. App. 366; Railway v. Jones, 95 U. S. 439.] It will readily be conceded that when the master uses reasonable care in providing his servant with a reasonably safe place in which to work and furnishes him with reasonably safe tools and appliances and the servant voluntarily chooses to work in a more dangerous place or with tools less safe and is injured thereby it is he who is to blame, because he fails to profit by his master's care and foresight. [Shore v. Bridge Co., 111 Mo. App. l. c. 288.] When the servant has the choice of two ways of performing his labor, one of which is comparatively safe and the other dangerous, and himself selects the latter, he is guilty of negligence. [Moore v. Railway, 146 Mo. 572; Montgomery v. Railway, supra; 1 Bailey on Master and Servant, sec. 1121.] The rule is well illustrated in the Montgomery case, supra. There, the moving car, upon which the brakeman attempted to ride, was provided with a handhold and footrest at one end for that very purpose. The brakeman jumped upon the car at the other end where no footrest was provided and stood upon the brakebeam. Clearly, the place he chose was more dangerous than the one furnished by the master and we held him guilty, in law, of negligence. But that case and the others cited differ widely in essential features from the one in hand. Were we in the position of the jury, we would hesitate before saying that a reasonably careful and prudent person in plaintiff's situation would have refrained from partially supporting his body on the seat offered by the drawbar. We see nothing in the position he took to indicate that it was more dangerous than any other position on the footboard. It is true plaintiff in all likelihood would have escaped this particular and peculiar injury, had he not partially seated himself. But it is neither logically safe, nor just,

in the characterization of an act, to attach great weight
to a result following it that does not appear to be an
ordinary and likely consequence. The result is not the
true test and the mere fact that a servant is injured be-
cause of the way of performing a duty which he selected,
when, if he had selected the other way, injury would
have been avoided, does not pronounce him careless.  [1
Bailey on Master and Servant, sec. 1122.]

Ordinary prudence requires a person to take into
consideration the natural and probable consequences of
a given act and not such as are remote, speculative or
merely possible.  It is not suggested, nor does it seem
possible, that the position of plaintiff enhanced his risk
except in case of some extraordinary happening such as
the derailment of the engine.  To agree with defendant's
contention would require us to assume, as indubitable,
that plaintiff in the exercise of reasonable care should
have considered when he took his position the contin-
gency of a derailment or other disaster to the engine
and should have anticipated that in such event it would
be safer for him to stand on the footboard than to par-
tially support himself on the drawbar.  Taking into
consideration the facts that the engine had but a short
distance to go, was moving very slowly, had a clear and,
to plaintiff's observation, an apparently safe track
ahead of it; we cannot say that in law plaintiff should
have anticipated a derailment.  The inherently danger-
ous nature of his employment required of him the vigi-
lant use of his senses to discover possible dangers, but
with none open to his observation he was justified in as-
suming that defendant had performed its duty to pro-
vide him with a reasonably safe track.

But could it be said that the hazardous nature of
plaintiff's employment required him to be in constant
anticipation of danger from hidden or fortuitous causes
as well as from those open to observation; we find no
justification for a judicial pronouncement that his posi-

Dunphy v. Stock Yards Co.

tion certainly increased his danger even in the facts of the happening itself, upon which much stress is laid by defendant. The footboard bore the brunt of the shock of the derailment and was violently and suddenly displaced. Certainly, it was a dangerous support at that moment and to attempt to make a comparison between the danger of plaintiff's position and that attending a standing position on the footboard would be nothing more than guesswork. In our view, the classification of plaintiff's conduct was essentially an issue of fact for the jury.

Another argument advanced by defendant in support of its insistence that the demurrer to the evidence should have been sustained is that, under the facts disclosed by plaintiff, it was physically impossible for him to have sustained the injuries of which he complains in the manner claimed by him. These are the facts detailed by plaintiff. The injury occurred between ten and eleven o'clock in the morning. Plaintiff experienced no pain at the time in the parts affected and did not know he had been hurt until perhaps an hour afterwards. He did immediately suffer from nausea of some severity, but made no complaint. When the engine was replaced on the track, he resumed work and worked through the day. His testicles began to pain him about an hour after the injury and the pain increased during the day. After he went home in the evening, he complained to his brother of his injury and both examined the injured parts. Two blue marks were discovered on opposite sides of the surface of the bag indicating that it had been severely pinched. The next day plaintiff reported for duty and worked after a fashion, but was greatly distressed by the pain which then was quite severe and continued to increase. He attempted to work during the next two days and then was compelled to cease on account of the injury. The day he quit work he consulted a physician, who directed him to go to bed and use hot flaxseed poultices. He remained under this doctor's care

about a month and then employed Dr. Davis, who treated him for several months and then found it necessary to remove one of the testicles on account of its rotten condition.

Defendant insists and in this is supported by the expert testimony it introduced, that it was utterly impossible for the testicle to have received an injury from a blow or from sudden compression of such severity that degeneration would follow without the accompaniment of intense pain and, since plaintiff admits he suffered no pain, we are asked to declare that he received no injury to his testicles from the negligence charged. Defendant argues and attempted to prove that plaintiff for a year or more preceding the occurrence in question had been afflicted with a venereal disease called gonorrhea, which he had neglected to have treated, and that this disease could have produced the condition discovered by Dr. Davis when he took charge of the case. The experts all agree that this disease, if neglected, may result in the destruction of the testicles though the recorded instances are rare, but the weakness of defendant's theory is that it is without any foundation in the facts disclosed by the evidence. The whole fabric is built upon an admission made by plaintiff that about one year before his injury the physician of the Burlington Relief Association had examined him and told him he had the disease. This was purely hearsay and devoid of probative value. Plaintiff vigorously denied that he had the disease or any of its characteristic symptoms. The physician, who first treated him, gave him no treatment for it and Dr. Davis, who testified, stated that he found no evidence of its presence. We are therefore confined to the consideration of a single question, is the inference that plaintiff's injury resulted from a blow or bruise received during the derailment so plainly opposed to natural law as to compel its rejection?

It is well settled that courts will not stultify themselves by giving any heed to the testimony of witnesses or

the inferences deducible therefrom that are so opposed to all natural law and reasonable probability as to be manifestly false. [Nugent v. Milling Co., 131 Mo. 241, 253; Hook v. Railroad, 162 Mo., 580.] But, on the other hand, courts should observe the utmost caution to avoid assuming knowledge of natural facts and laws that are beyond the scope of common positive knowledge. [Lange v. Railway, — Mo. App. —.] The mysteries of nature are so manifold, deep and subtle that the finite mind cannot indulge in dogmatic conclusions respecting them without falling into error. Human nature, being microcosmic, is not certainly known save in its most prominent outlines. Different men in their physical characteristics differ as widely as they do in outward appearance. No two individuals are alike and, when we are called upon to apply procrustean rules, we should see to it that they fit all alike. It has been said that one man's meat is another's poison. What will kill one man will hardly injure another and what will cause excruciating pain to one is often quite painless to another.

Dr. Davis, a reputable and skilled physician, reached the conclusion from his knowledge of the case and its history that plaintiff's condition was the direct result of the injury of which he complains. His process of reasoning is rational and plausible. In his opinion, intense pain does usually accompany a violent injury to the testicles, but the presence of pain and its degree depend upon the physical peculiarities of the subject, the nature of the injury, and the circumstances under which it is received. In his science, he knew of five causes that could have produced the degeneration, cancer, syphilis, gonorrhea, tuberculosis and external injury. His investigations disclosed no evidence indicating the presence of any of the first four mentioned. By exclusion but one cause was left that could have produced the condition before him and this he accepted as the real cause. Although it seems extraordinary that plaintiff should have escaped immediate pain, we cannot say that this fact

made his injury in the manner charged a physical impossibility. The learned trial judge committed no error in treating this issue as one of fact.

The demurrer to the evidence was properly overruled.

Most of the objections made to the instruction given have been answered in what has been said. We have considered the others and find that no substantial error was committed. We have also carefully considered the questions presented relative to the admission of evidence and are satisfied with the rulings made. It would unduly lengthen this opinion and serve no useful purpose to discuss all of the numerous objections urged. The case was fairly tried and the judgment is affirmed. All concur.