SALLIE HARPER v. ST. LOUIS MERCHANTS BRIDGE TERMINAL COMPANY, Appellant.

In Banc, March 16, 1905.

1. **NEGLIGENCE: Proof: Proximate Cause.** It is not sufficient for a recovery to prove negligence; it must also be shown that the negligence proximately caused or contributed to the injury. A causal connection between the negligence shown, even though it be *per se* negligence, and the injury, must be shown, either by direct testimony, or by proof of such facts as logically create the inference.

2. ———: **Unexplained Derailment of Car: Position of Brakemen: Ordinance.** Plaintiff's husband was killed by the swinging

around of a derailed car which left the track while the train was running on the street, and struck him while he was at work near the track. An ordinance required that "no freight train shall at any time be moved within the city limits unless it be well manned with experienced brakemen at their posts, who shall be so stationed as to see the danger signals and hear the signals from the engine." *Held*, that this language means that brakemen should be so located on a moving freight train that they can not only see and hear danger signals, but can give them to those whose duty it is to receive and obey them; and so, if the rear brakeman, although on the ladder of the derailed car, instead of on its top, was so situated that he saw the danger and promptly passed his signal to the head brakeman, who caught it and transmitted it on to the engineer, the ordinance was complied with; and as there was no causal connection between the rear brakeman's being on the side of the car, and the injury to plaintiff's husband, the ordinance should have been excluded.

3. ———: ———: **Duty of Brakeman.** It cannot be held, as a matter of law, that it is the duty of a brakeman on top of a car being derailed to remain there to set the brakes, in peril of his own life.

4. ———: ———: **Duty to Stop Train.** It is the imperative duty of those in charge of a train on the street of a large city at a much frequented place, to stop the train when one end of a car leaves the track, and that is the law whether the party injured thereby was a trespasser or a licensee near the track, or whether any one at all was injured. But if as a matter of fact there is no evidence that they did not meet that duty, but on the contrary all the evidence is that they promptly performed it, the railroad company is not liable for an injury caused by the unexplained derailment of a car.

Appeal from St. Louis County Circuit Court.—*Hon. Jno. W. McElhinney*, Judge.

REVERSED.

*McKeighan, Wood & Watts* and *Wm. R. Gentry* for appellant.

(1) The court erred in admitting in evidence the ordinance of the city of St. Louis requiring a train to be manned with experienced brakemen at their posts. There was no evidence that the ordinance was violated,

and nothing from which it could be inferred that if it was violated its violation contributed to cause the accident. Hence, it formed no basis for recovery against defendant. Karb v. Railroad, 55 Mo. 476; Hanlon v. Railroad, 104 Mo. 381; Barkley v. Railroad, 96 Mo. 367. (2) The court erred in overruling defendant's demurrer to the evidence, because: (a) The plaintiff, having specified the acts of negligence of which the defendant was charged to be guilty, was bound to prove at least one such act of negligence. Having failed to do this, she was not entitled to have her case submitted to the jury. McCarty v. Hotel Co., 144 Mo. 397; Feary v. Railroad, 162 Mo. 75; Fuchs v. St. Louis, 167 Mo. 620. (b) Since the deceased was not an employee, the plaintiff, having proceeded under section 2864, Revised Statutes 1899, is not entitled to recover for any defect in the track or in the cars. McKenna v. Railroad, 54 Mo. App. 161. (c) The deceased being a trespasser, or, at best, a bare licensee, the defendant owed him no duty whatever until his position of peril was known to the servants in charge of the train. There was no evidence offered tending to show that anyone of the train crew saw deceased until after the accident. Therefore, even if they did not act as promptly as they might have done, after the car left the track, the plaintiff cannot recover on that account, since they violated no duty towards the deceased. 2 Thompson on Negligence, sec. 1722; 1 Thompson on Negligence, secs. 946, 948; Feeback v. Railroad, 167 Mo. 216; Barney v. Railroad, 126 Mo. 389; Reardon v. Railroad, 114 Mo. 405; Riley v. Railroad, 68 Mo. 661; Heiter v. Railroad, 53 Mo. App. 336; Henry v. Railroad, 76 Mo. 295; Barker v. Railroad, 98 Mo. 54; Wencker v. Railroad, 169 Mo. 592; Glazer v. Rothschild, 80 S. W. 332; Barney v. Cemetary Assn., 80 S. W. 709; Metcalf v. Steamship Co., 147 Mass. 66; Sweeney v. Railroad, 72 Mass. 372; Smith v. Packing Co., 82 Mo. App. 9. (d) No negli-

gence having been shown, the demurrer to the evidence should have been sustained. Chandler v. Glass Co., 174 Mo. 321; Burnes v. Railroad, 129 Mo. 41. (3) The court erred in giving improper instructions. (a) No. 2 was not supported by any evidence. It is error to give an instruction not supported by evidence. McAtee v. Valandingham, 75 Mo. App. 45. (b) No. 3 declared an incorrect proposition of law. Cannon v. Railroad, 62 N. E. 8. (c) No. 4 omitted the question of the knowledge of deceased's danger on the part of defendant's servants, and was therefore error.

*P. H. Cullen* for respondent; *Joseph S. McIntyre* and *Robert Shackelford* of counsel.

(1) It was the duty of the defendant to exercise ordinary care in running its trains in a populous city and over a public street. All the proof shows that by the exercise of ordinary care the train could have been stopped after it got off the track and before it struck deceased. Holden v. Railroad, 177 Mo. 456; Brown v. Railroad, 50 Mo. 461; Frick v. Railroad, 75 Mo. 595. (2) Deceased was not a trespasser under the undisputed evidence in the case, and the instruction on this theory is correct and is a substantial copy of instruction 6, on page 368 of the Lemay case. Lemay v. Railroad, 105 Mo. 361; Lynch v. Railroad, 111 Mo. 601; Gunther v. Railroad, 108 Mo. 18; Swadley v. Railroad, 118 Mo. 276. (3) The evidence tended to show that the train was not well manned with experienced brakemen at their posts, as prescribed by ordinance; hence, this was negligence *per se,* and the instruction on that theory is correct and has been approved. Dahlstrom v. Railroad, 108 Mo. 533. (4) Where the proof shows that the public, generally, has been accustomed to use tracks of the railway company, the company will become liable in damages for killing or injuring one using the tracks for passage if, by the exercise of ordinary or reason-

able care, it might have become aware of his position in time, by the exercise of like care, to avoid injuring him in giving warning signals, in checking or stopping, to avoid killing or injuring him. Fearons v. Railroad, 79 S. W. 395; Gunther v. Railroad, 108 Mo. 18; Davis v. Railroad, 46 Mo. App. 180; Duncan v. Railroad, 46 Mo. App. 198; Lynch v. Railroad, 111 Mo. 601; Parlin v. Railroad, 65 Mo. 22; Brown v. Railroad, 50 Mo. 561; Isabel v. Railroad, 60 Mo. 475; Dahlstrom v. Railroad, 96 Mo. 99; Kelley v. Railroad, 18 Mo. App. 151; Dunkman v. Railroad, 95 Mo. 232; Werner v. Railroad, 81 Mo. 368; Scoville v. Railroad, 81 Mo. 454; Railroad v. Stout, 17 Wall. 661. (5) Even if Harper was there under a license or a mere permission which they might at any time revoke, and under circumstances which did not make them responsible for any defect in the existing condition of the premises, they were still liable for any negligent act of themselves or their servants which increased the danger of passing, and in fact injured him. In other words, defendant is liable for its active negligence. Gallagher v. Humphrey, 6 L. T. (N. S.) 684; Sullivan v. Waters, 14 L. R. C. L. 474; Indermaur v. Dames, L. R. 1 C. P. 274; Carrigan v. Sugar Refinery, 98 Mass. 577; Byrne v. Boadle, 2 Hurl. & C. 722; Stewart v. Harvard College, 12 Allen 67; Barry v. Railroad, 92 N. Y. 293; Byrne v. Railroad, 104 N. Y., 10 N. E. 539; Pamponis v. Railroad, 66 Conn. 528. (6) The derailing of a train and its running into an adjacent building presents a case of actionable negligence, if by ordinary care it could have been stopped before it struck the building. Walsh v. Railroad, 102 Mo. 585; Lane v. Railroad, 43 La. Ann. 833; Howser v. Railroad, 27 L. R. A. 154; Swadley v. Railroad, 118 Mo. 268.

LAMM, J.—The vital facts of this case are:

J. B. Harper was a sign-tacker. Cass avenue is an east and west thoroughfare in St. Louis, sixty feet be-

tween building lines, and thirty feet from curb to curb.
Florida street also runs east and west and lies north
of Cass. Appellant operated its switch engines to shift
freight cars on tracks which, from the south, crossed
Cass avenue on a down-grade with reverse curves and
bore to the northeast. At this point was a cluster of
tracks, the west one of which concerns the case. Along
the west side of this west track, running northeast-
wardly from Cass avenue, lay a passway for pedes-
trians on appellant's vacant ground, of a width vary-
ing from six to eight feet, where many people for many
years daily passed to and fro from Cass avenue to Flor-
ida street without let or hindrance. Flush with the north
line of Cass avenue, with its east or rear end abutting
on said passway, stood Woolfert's livery stable, and
on said rear or east end sign-tackers for a long time,
using it as a common bill board, had tacked signs ex-
ploiting the wares of manufacturers and venders, by
the acquiescence of the stable proprietors.

On the forenoon of October 25, 1900, Harper was
standing on a short ladder plying his trade. The foot
of the ladder, it seems, was planted in said passway a
little north of the southeast corner of the barn, and he
was in the act of tacking a tobacco sign on the barn,
when a derailed freight car in a short train pulled
north on said west track in charge of appellant's ser-
vants, and the rear end of the car, swinging to the west,
wedged Harper against the barn, smashed him, and
drove his hammer into his neck, killing him instantly.

The plaintiff, as widow, sued for five thousand dol-
lars penalty under section 2864, Revised Statutes 1899,
recovered judgment, and defendant appealed.

In a voluminous petition she lays many acts of
negligence at defendant's door. There was dirt on the
rails, she says, with sand and debris of timber and
stone, the track was laid in sharp curves, the rails were
not securely fastened to the ties, the rails were spread

and worn so as to be insufficient to support the cars, the roadbed was spongy, the ties rotten, the cars had broken and weak wheels, axles and supports, no watchman or gates were kept or maintained at the crossing as provided by ordinance, defendant's agents running the train negligently "gave said train violent kicks" and "then negligently" gave said train "sudden, violent jerks," and pulled said train at an unlawful rate of speed at an excess of six miles per hour, a rate denounced by ordinance, and failed to keep a lookout for persons on its tracks and premises, and in said passway, and ran its train without sounding its bell and negligently failed to keep said train in control.

Not content with this bristling array of specified points, on any one or all of which it was sought to impale defendant, plaintiff charged furthermore that her husband was killed by "the criminal intent of the officers, agents and servants and the employees of defendant in manner and form and under the circumstances aforesaid."

The state of the proof was such that none of the foregoing specifications were submitted to the jury. The theory the cause was tried on is found in two averments of the petition, viz.: (1) that the train ran in violation of section 1753 of an ordinance of the city of St. Louis, the pertinent clause of which is as follows: ". . . and no freight train shall at any time be moved within the city limits unless it be well manned with experienced brakemen at their posts, who shall be so stationed as to see the danger signals and hear the signals from the engine," and (2) in the further allegation: "Plaintiff states . . . that the said J. B. Harper had no knowledge that said car was off the track and running as aforesaid, but the officers, agents and servants of the defendant, whilst so running said freight train knew this fact or might have known it by the exercise of ordinary care, and that the said servants knew or might by the exercise of ordinary care

have known that plaintiff's husband was at or near the southeast corner of said building and in great danger of being killed, and that after the agents, officers and servants of the defendant knew or might have known by the exercise of ordinary care that said car was off the track and plaintiff's husband in a position of peril, they, the said agents and servants, negligently and unskillfully failed to stop said car when by the exercise of ordinary care on their part, said car could have been stopped and the injury and death of plaintiff's husband averted; and the said agents also failed and neglected to give plaintiff's husband any warning of danger and if they had done so his life could have been saved. . . .''

Referring to the first issue submitted to the jury, the proof failed to show the brakemen on the train were *inexperienced,* so that the first allegation of negligence was narrowed down to the question of whether the train was well manned by brakemen at their posts so stationed as to see danger signals and hear signals from the engine, and the issue was submitted in that form.

Referring to the second issue submitted to the jury, it was presented on the theory that the derailment was *unaccounted for* and that no liability was predicated of negligences leading up to the derailment itself, but that the only question was whether defendant by the exercise of ordinary care, after it discovered or should have discovered by the use of such care that the car was off the track and running wild, could have stopped the train in time to have prevented Harper's death.

At the trial respondent was allowed to introduce section 1753 of said ordinance, containing the ''well-manning'' clause aforesaid, over the objections of appellant and error is predicated thereof.

There was an immaterial conflict in the evidence bearing on the initial point of the derailment. On the one hand, respondent's proof tended to show that the rear truck of the rear car jumped the track at a dis-

tance varying, as estimated by the eye, from twenty to seventy feet south of the south building line of Cass avenue. One of her witnesses estimated it at eighty feet south of the south *curb* line, another at 125 feet south of *Woolfert's stable,* and another at from twenty to forty feet south of the building line. None of the witnesses measured the distance, but the marks of the derailed car's wheels silently and truthfully told the tale. On the other hand, appellant at once caused the fresh marks to be followed and the distance mathematically ascertained and showed by two uncontradicted witnesses that the rear truck left the track ninety-six feet south of where Harper's body lay or sixteen feet south of the south building line of Cass avenue.

Respondent introduced some eye-witnesses, whose testimony, in substance, tended to show that their attention was drawn by the rumble of the derailed car when it reached Cass avenue. Some of them then saw switchmen or brakemen running and some saw them walking on the ground near the train and signalling, but no one of said witnesses undertook to locate the switching brakemen when the train started, or at the point of derailment, or to say that no brakemen whatever were on the train. Their evidence did, however, indicate that none were on the rear car while it passed over Cass avenue. Respondent further introduced evidence, which remained uncontradicted, that the derailed car was stopped practically at the southeast corner of Woolfert's stable, and further that a train, of the length of the one in question and thus equipped, could be stopped in from thirty to forty feet when going at a speed shown by the testimony, and further that the proper places for brakemen on a train were one behind and one ahead to receive and give signals and that they should be so located as to readily perceive and give instant signals to the engineer when, by any hap, things went wrong.

It was shown by appellant, and stands practically

uncontradicted, that at the time in question appellant's engineer backed his engine down to a cut of four freight cars for switching purposes, the intention being to pull the rear car down to the main line, throw the car off and shove back with the remaining three. The north end of the north car (the one coupled to) stood on or about the building line on the south side of Cass avenue. While standing there coupled to the train, the engine and tender occupied nearly the entire width of Cass avenue as the engine faced north with its nose a trifle south of the north line of Cass avenue and close to where Harper was killed. The engineer being on the right of the cab, there was no testimony as to whether Harper was in the line of his vision as he stood on his ladder to the left of the engine and near its head. Three brakemen composed the switching crew—Cummings, Holland and Randolph. When the train started Cummings was on the top of the head, or north car, and remained there, Randolph hung to a ladder on the east side and toward the rear of the rear car in *plain view of Cummings,* and Holland was at the forward end of the same car. Being ready to go, Cummings got a signal from the rear brakeman and gave it to the engineer, who looked ahead to see if he had a clear track, saw he did, and turned on steam and pulled his bell cord. Once fairly underway on a down grade, and at a time when the engine must have been in part or wholly past Harper, the engineer properly turned his face to his train to watch for signals. Feeling no jar and seeing nothing awry, the first intimation of danger he had was when he got a violent stop signal from Cummings, and this after he had gone so much as three car lengths, say ninety feet. As quick as brain and hand could act he shut off steam, applied his steam brake, opened his sand lever, reversed his engine, gave it steam in the opposite direction and stopped — all in about a car's length, or at most forty or fifty feet, after he got his signal. Neither the engineer, nor Cummings,

nor Randolph, saw Harper, but that Harper must have known of the presence and movement of the train seems an irresistible conclusion. Holland did not testify and the fireman was dead at the trial below.

Appellant further showed, and the evidence was unimpeached, that presently after the train was underway the rear truck of the rear car, for some unexplained cause, left the rails and Randolph, as soon as he realized it, left the car, signalling as he did so and, when he reached the ground, continuing his signals, and Holland did likewise. Cummings had felt no jar and his first intimation of danger was when he saw Randolph make a signal to him, leave the car and continue his signals running on the ground. The curve made it impossible for the engineer to see Randolph but Cummings at once signalled the engineer with the results aforesaid.

The court instructed the jury at the instance of respondent in substance (1) that they must find for plaintiff in the sum of five thousand dollars or nothing; (2) that if they found the train was not well manned with brakemen at their posts so stationed as to see the danger signals, etc., then such failure was negligence and if Harper was killed as the result of such negligence, their finding should be for plaintiff; (3) that Harper, if the jury found the passway had been constantly used by foot travellers by the acquiescence of defendant and the barn had been used as a bill board by the acquiescence of those in charge, was no trespasser; (4) that if they found Harper was using ordinary care and found that defendant by the exercise of ordinary care could have stopped said train in time to have avoided striking him and that as a consequence of such failure, did strike and kill him, then the finding should be for plaintiff; and (5) gave an instruction defining ordinary care.

Appellant prayed a peremptory instruction in the nature of a demurrer to the evidence, which was re-

fused and then asked and got other instructions which, in the view we take of this case, need not be noticed.

Appellant, having demurred to respondent's testimony at the close of her case and saved an exception to the court's refusal to allow that, as well as its peremptory instruction at the end of the whole case, and to the giving of all of respondent's instructions, now presses before us all said rulings, together with the action of the court in admitting section 1753 of said ordinance, as reversible error.

I. Did the court, *nisi,* commit error in allowing the introduction of section 1753 of the St. Louis ordinance? And, as a corollary to that, was the error renewed in giving respondent's instruction number 2?

In the philosophy of the law of actionable negligence the proof of negligence itself is but one step toward recovery. Another step is to show by direct testimony, or by the proof of such facts as logically create the inference, that the negligence proved proximately caused or contributed to the injury. The one step, without the other, is idle and might as well not be taken. Hence in this case, if it be conceded, *arguendo,* that the brakemen were not in proper position and if it be conceded further that such failure was negligence *per se,* yet if there was no causal connection between such negligence and Harper's death, the negligence became innocuous. [Walsh v. Railroad, 102 Mo. 587.] It will be seen that liability in this case is not predicated of the fact of derailment. That issue was not submitted to the jury, and, if it had been, it could not be contended in a forum of reason that on the record facts here, the mere *location* of the brakemen on the train had aught to do with the derailment of the rear car. If the location of the brakemen becomes material to the case, it must be because it bears on their ability to apprehend danger and their ability to receive and communicate signals pertaining to that danger, or their

ability to avert the danger otherwise. Now, it is self-evident that brakemen, stationed as Cummings and Randolph were, could apprehend danger from a derailed car precisely as soon and as accurately as if Randolph had been on top of the car instead of clinging to its side. In this connection we cannot accept appellant's view that the well-manning clause of the ordinance means simply that brakemen should be so stationed as to *see* the danger signals and *hear* the signals from the engine. Such view is too close and narrow, adheres to the mere dry letter of the text and squeezes the life out of a humane regulation. The ordinance, broadly construed, contemplates that brakemen should be so located on a moving freight train in St. Louis that they cannot only see and hear danger signals, but can *give* them to those whose duty it is to receive and obey them. Applying this construction to the ordinance and applying the ordinance to the facts, we see that Cummings was in his place as head brakeman, and that Randolph as rear brakeman was in plain sight of Cummings and Cummings was looking directly at him, and, as his duty was, caught and passed on his danger signals to the engineer. So that Randolph's clinging to the side of the car had nothing to do with his perception of danger or his ability to communicate those perceptions to Cummings. The gist of the thing was to get his knowledge to Cummings and this duty in this instance was performed as effectually on the side of the car and on the ground as if Randolph had been on top of the derailed car.

There remains to consider whether if Randolph had been on top of the derailed car he could have applied the brakes and shortened the stop, but this theory contemplates his *remaining* in a place of peril and will be disposed of further on.

There was no causal connection between Randolph's location on the ladder at the side of the car and the death of Harper, and it follows the ordinance

should have been excluded and respondent's instruction number 2 refused.

We do not decide that there might not be cases where the proper position of the rear brakeman on a moving freight train in a populous city is on top the car and his absence therefrom be the proximate cause of an injury; all we hold is that Randolph's position on the side of the rear car, under the facts presented, had no causal connection with the deplorable accident or contributed not a whit thereto. This conclusion is based on the reason of the thing and is sustained by authority (see authorities in briefs of counsel). The facts in the Dahlstrom case, relied on by respondent (108 Mo. 525), are dissimilar, and this opinion is not out of line with the law there declared, or with any ably-decided cases cited by respondent.

II. Was the case entitled to go to the jury on the theory presented by respondent's instruction number 4, viz., that after the rear truck left the rails, appellant's servants were negligent in not stopping the car in time to have prevented Harper's death? and was it error to overrule appellant's peremptory instruction?

It goes without saying that no hard and fast rule defining negligence otherwise than in general form can be or ought to be formulated by the law. The underlying reason of the thing requires that each case should stand on its own pertinent facts, in order to give that flexibility to ordinary care which would make it a test of liability in the interlacing and the varying relations and transactions of modern life.

Take the case at bar: self-evidently Harper was no trespasser. He was at least a licensee. But it would be hair-splitting to allow this case to ride off on a sour notion of the degree of care due a mere licensee, as urged by appellant, for in our view his being a licensee is neither a controlling nor an important fact. Harper was not on the track itself. If the servants of

appellant saw him, they saw him at a place of no jeopardy from trains running on the rails. He was killed by the swinging end of a car off the rails. We place our decision on the broad grounds that if the engineer or the brakeman should have seen him, or might have seen him, or did see him, it would not have added a feather's weight to their duty to use ordinary care to stop that wild car, lurching over the street of a great city at a much-frequented place, a deadly menace to life, limb and property. The duty to stop that car was present and imperative, and a knowledge of Harper's exposure neither created or intensified it, under the facts of this case. So that, if we could find a particle of substantial evidence in the abstract tending to show that such humane and mandatory duty was neglected, we would sustain instruction number 4 and reverse and remand the case for the error pointed out in paragraph one of this opinion, but a critical review discloses no direct or inferential evidence of this character. In the Walsh case, cited by respondent (102 Mo. 587), the unlawful momentum of the train (a factor not present here) was held a proximate cause of the injury. And in the Swadley case (118 Mo. 277) the gist of the thing was the derailment itself and the track was shown to be in an unsafe condition from rotten ties and rails insecurely fastened. That case has no application to one like this, where the derailment is unexplained.

Nor can we hold as a matter of law that if Randolph had been on top the rear car at the moment of derailment, it would have been his duty to have stayed there and set his brake. The law of nature, the spontaneous and impelling law of self-preservation, is of ancient and entirely respectable origin, and a brakeman on top of a derailed, swinging freight car seems fairly within its purview; and all this without giving any force to the maxim, "All that a man hath will he give for his life." The doctrine formulated in that often

misquoted saying is unorthodox and is not only stated too loosely, but its gloomy and sinister author does not recommend it to the courts of a Christian commonwealth (Job 2:4, *quod vide*).

If it be conceded that Randolph's duty was to give a signal to warn of a danger known only to him, he performed that duty as he sprang from the car and again as he reached the ground. His signals were promptly caught, and, being promptly repeated to the engineer, were by him rightly interpreted and at once acted on, and the car was quickly brought to a standstill.

Making every inference of fact in favor of respondent's evidence, we can see nothing tending to show a lack of care in stopping the car. It follows that, as respondent's instruction numbered 4 has no evidence to support it, the demurrer should have been sustained, and, failing in that, appellant's peremptory instruction should have been given.

The cause is reversed. All concur.