# ELIZABETH PEPERKORN, Respondent, v. ST. LOUIS TRANSFER RAILWAY COMPANY, Appellant.

St. Louis Court of Appeals.    Argued and Submitted January 16, 1913.    Opinion Filed March 1, 1913.

1. **RAILROADS: Action for Death from Backing Train: Violation of Municipal Ordinance.** In an action for the death of a person run over in a chute by a backing railroad train, evidence *held* to warrant a finding that the space between the top of the car farthest from the engine and the top of the chute was sufficient to make it practicable for a brakeman to ride on the top of that car, as required by Sec. 1857, Rev. Code of the City of St. Louis, which provides that a brakeman shall be on such car to give warning, etc.

2. ———: ———: **Warning.** Ordinary care demands that a railroad company backing a train through a long dark chute, so placed as to invite persons to walk in it, should keep a lookout, and, if not practicable to have a man ride on the car farthest from the engine, to have one precede the train, to give warning of its approach.

3. ———: ———: **Violation of Municipal Ordinance.** In an action for the death of a person run over in a chute by a backing railroad train, evidence *held* to show that the train was not manned with experienced brakemen at their posts, so stationed as to see and hear danger signals, as required by Sec. 1857, Rev. Code of the City of St. Louis.

4. ———: ———: ———: **Substantial Compliance: Instructions.** In an action for the death of a person run over in a chute by a backing railroad train, the court charged the jury at the instance of defendant that if they found that the act of sending a brakeman through the chute was for the purpose of complying with Sec. 1857, Rev. Code of the City of St. Louis (providing that, when trains are being backed within the city, a brakeman shall ride on top of the last car farthest from the engine to give warning etc.), and if the jury found that such act was a

substantial compliance with the ordinance, their verdict should be for the defendant. *Held*, that while the propriety of giving the instruction will not be determined, nevertheless it having been given at defendant's instance, defendant is concluded as to the issues it submitted, by the verdict of the jury.

5. ————: ————: ————: Proximate Cause. In an action for the death of a person run over in a chute by a backing railroad train, evidence *held* sufficient to show that the cause of death was defendant's failure to observe Sec. 1857, Rev. Code of the City of St. Louis, which provides that trains backing within the city shall have a man on the car farthest from the engine to give warning, etc.

6. ————: ————: ————: Sufficiency of Evidence. In an action for the death of a person alleged to have been run over by a particular railroad train, which backed into a chute, it was shown that decedent's body was found under a car in the chute, one leg having been severed from his body and carried a distance of 60 ft. from the place where the body rested and in the direction in which the train moved, that blood and shreds of clothing were found on the forward trucks and wheels of the forward car of the train, and that no other train passed through the chute that night. *Held*, that the evidence was sufficient to show that deceased was killed by the particular train alleged.

7. NEGLIGENCE: Action for Death: Evidence: Presumptions. In an action for death, it is presumed that decedent did not commit suicide; and if there is any ground for presumption, it is directly against that of carelessness, which, usually being contributory negligence, must be alleged and proved by defendant.

8. ————: Speculation and Conjecture: Instructions. In an action for death, where there was no reason to suppose that the death occurred in any other way than by the means alleged, an instruction requested by defendant, cautioning the jury against speculation, conjecture and guess work and charging that, if they were unable to determine the cause of death, except by speculation, to find for defendant, was properly refused, for the reason that it would have been misleading.

9. RAILROADS: Backing Train: Municipal Ordinace: Applicability. Sec. 1857 of the Rev. Code of the City of St. Louis, providing that a brakeman shall be stationed on the car farthest from the engine of a backing train, and that certain warnings shall be given, etc., covers a switch track which runs through a long, low chute.

10. ———. **Action for Death from Backing Train: Violation of Municipal Ordinances: Instructions.** In an action for the death of a person run over in a chute by a backing railroad train, an instruction given for plaintiff, submitting as a predicate of recovery a violation of Sec. 1857 of the Rev. Code of the City of St. Louis, which provides that when a train is backed within the city, a brakeman shall be stationed on the car farthest from the engine to give warning, etc., and that the train shall be well manned with experienced brakemen at their posts, so stationed as to see and hear signals, etc., *held* to be free from error.

11. **APPELLATE PRACTICE: Objections to Questions: Trial Practice.** An objection to a question which is not made until after the answer is given is too late and will not be considered on appeal unless the record shows that the witness answered so quickly and that there was no time to object.

Appeal from St. Louis City Circuit Court.—*Hon. W. B. Homer,* Judge.

AFFIRMED.

*S. P. McChesney, T. M. Pierce* and *G. T. Priest* for appellant.

(1) The court erred in overruling defendant's demurrer to the evidence, because defendant's negligence as charged (a failure to warn) was not the proximate cause of deceased's injuries; it conclusively appearing that deceased knew of the presence and approach of the cars which it is alleged struck and killed him. Davies v. Railroad, 136 S. W. 720. (2) The court erred in overruling defendant's demurrer to the evidence, because there is no causal connection established by the evidence between deceased's death and defendant's alleged breach of the ordinance. Holman v. Railroad, 62 Mo. 562; Warner v. Railroad, 178 Mo. 125; Beyerly v. Light Co., 130 Mo. App. 593; King v. Railroad, 211 Mo. 14. (3) The court erred in overruling defendant's demurrer to the evidence, because the ordinance in question does not apply to such a situation as disclosed by the record. Railroad v. Mali, 5 Atl. 90; Rafferty v. Railroad, 91 Mo. 33.

*Wilfley, Wilfley, McIntyre & Nardin* and *Taylor B. Wyrick* for respondent.

(1)   The ordinances relied upon applied to the location of the accident and the circumstances surrounding it, as well as to any other locality in the city of St. Louis.   Merz v. Railroad, 88 Mo. 672; Grube v. Railroad, 98 Mo. 330; Bluedorn v. Railroad, 108 Mo. 439; Prewitt v. Railroad, 134 Mo. 615; Jackson v. Railroad, 157 Mo. 633.   (2)   The causal connection between the deceased's death and the negligence complained of was established beyond a reasonable doubt, while the law requires only that there may be a basis for a reasonable inference that the negligence caused the injury, when the connection between the negligent act and the injury is clearly established.   Buesching v. Gas Light Co., 73 Mo. 219; Settle v. Railroad, 127 Mo. 336; Cambron v. Railroad, 165 Mo. 543; Yongue v. Railroad, 133 Mo. App. 141; Goff v. Transit Co., 199 Mo. 694; Johnston v. Railroad, 150 Mo. App. 304.   (3) Where there is a duty to give a warning of an approach of a train, and the warning is not given, and injury results to one on the track, the law presumes that if warning had been given the person would have gone from the railroad track to a place of safety, this presumption extending even to the case of a horse.   Roberts v. Railroad, 113 Mo. App. 6.   (4) . The ordinance in question in this case has been construed to mean that the "well manning" clause requires the brakeman to be so stationed or on about the train, not only so as to see danger signals and hear signals, but also to give danger signals wherever they should be given, to avoid injury to persons on the track.   Harper v. Railroad, 187 Mo. 587.

STATEMENT.—By her amended petition upon which the cause was tried, plaintiff charges that her husband, John H. Peperkorn, hereafter referred to as the deceased, was killed by being run over by a train of

freight cars operated by the agents of defendant. After a charge of general negligence on the part of defendant, section 1857 of the Revised Code of the city of St. Louis, being ordinance No. 22902, approved March 19, 1907, is pleaded. This ordinance, so far as here involved, requires that the bell of the engine of any car or train of cars, propelled by steam power, when moving shall be constantly sounded within the city limits, and that if any freight car, cars or locomotives propelled by steam power "be backing within said limits, a man shall be stationed on top of the car at the end of the train farthest from the engine to give danger signals, and no freight train shall at any time be moved within the city limits unless it be well manned with experienced brakemen at their posts, who shall be so stationed as to see the danger signals and hear the signals from the enigne." Averring that this ordinance applies to and is binding upon defendant and was in full force and effect at the times mentioned, it is charged that the defendant carelessly and negligently violated it in three particulars: First, that while moving its freight cars against and injuring the deceased, defendant failed to sound constantly the bell of the engine attached thereto. Second, defendant while backing its cars within the city limits, failed to have a man stationed on top of the car at the end of the train farthest from the engine to give danger signals. Third, that defendant failed to have the freight train well manned with experienced brakemen at their posts, so stationed as to see the danger signals and hear signals from the engine. It is averred that the carelessness and negligence of defendant in violating this ordinance in the above particulars directly caused the injury and death of the deceased. Following this are averments seeking to bring the case within the last clear chance rule, but as this was not insisted upon at the trial, it is unnecessary to set them out. Damages are placed at $10,000.

The answer, after a general denial, pleads con-
tributory negligence on the part of the deceased.

A reply was filed, denying this.

A trial before the court and a jury resulted in a
verdict for plaintiff in the sum of $5000, from which,
interposing a motion for new trial and saving excep-
tions to the overruling of that, defendant has duly
perfected its appeal to this court.

Plaintiff and the deceased, John H. Peperkorn,
were husband and wife, the deceased at the time of his
death, then about seventy years of age, being in the
employ of the Mississippi Valley Elevator & Grain
Company as a night watchman at its elevator, situated
between Madison avenue and Clinton street and near
the Mississippi river, and within the limits of the city
of St. Louis. It was the duty of the deceased to look
after and make the rounds of the building during the
night. Along the east side of the elevator building is
what is known as a ''car chute,'' constructed for the
purpose of receiving cars for loading and unloading.
Through this chute a railroad track runs in a straight
line, nearly due north and south. The chute or pas-
sageway is closed at each end by doors, and is just wide
enough to admit a freight car, leaving a space of about
seven inches on either side of the car, between it and
the projections on one side of the outer wall and on the
other of the building. The space between the running
board on the top of the car and the beam of the south
doorway or entrance to this chute is about thirty-five
inches. There are girders or stringers inside of the
chute running at a pitch, that are higher at one end
than at the other, so that after the door beam is passed
there is a clear space between the running board on the
top of the car and the lowest part of these girders,
of forty-four inches on the east part of the top of the
car, while on the west part of the top of the car there
was a clear space between that part of the top and the
girder of forty-four inches on one side and between

fifty-three and fifty-six inches on the other. The chute was one hundred and eighty-five feet long; long enough to hold five or six freight cars at one time. A witness for plaintiff testified that he had ridden through this chute on cars; had ridden through there on the top of a car but "had to lie down on the car, because it wouldn't clear me on top; it wouldn't clear me if I'd stand up on top of the car." If he had stood up he would have been knocked off, while by lying down on top of the car one could go through. This witness further said: "You have got to stoop down if you want to get through there," and that it is the same all through the chute. The track which goes through this chute, starting from the north of Clinton street runs straight south over Clinton and through the chute until near Madison street and then, and before crossing Madison street curves rather sharply to the west, and after crossing Madison street runs south. It is two hundred and forty-five feet from the north line of Clinton street to the south line of Madison. That is, after leaving the chute, the track curves to the west until it has crossed Madison street. This train came from the south and the cars were shoved north along it and through the chute. The south doors of this chute roll up to the top. The north doors, double doors, open outward on hinges, as shown by a plat in evidence and before us.

About half past ten o'clock on the night of the accident, a train made up of a steam engine with about ten freight cars, which had been brought across the river by ferry, was stopped south of Madison street, so that the end of the rear car of the train, the forward car as the train was pushed, was stopped about one hundred and twenty feet from this south door and on the south side of Madison street. The switch foreman, who will hereafter be referred to as the foreman, who was superintending the movement of the train then being operated by defendant, walking forward, found

the south door to the chute open but the north doors closed. Whereupon the foreman sent what he calls his "hind man" through the chute to open the north doors and to see that the way was clear. The foreman remained at the south entrance of the chute in front and to the south of it, until he received the signal "O. K." from his man, who was at the back or north end of the elevator, that meaning that the way was clear to shove the cars in. The foreman testified that at the same time there was a lantern shown up about the middle of this elevator (the witness by the word "elevator" referring to this chute in the elevator), down on the track in the middle of the entrance "as you shoved through it," said the witness. "My hind man passed through and both lights appeared to move backward to the north door of the elevator; both appeared to be put together to me, but who this was—I didn't speak to them, nor didn't see them, but I only seen the light. Those two lights looked to me to be at the door, in the entrance at the back end—at the north end of the elevator. I received an O. K. signal to shove the cars in." It appears that there was another track to the east of this elevator track and outside of the elevator and to the east of it and of this chute, and that there was a box car on this track, the north end of the car about on a line with the south end of the elevator and chute. The foreman walked from the entrance to the chute along and around this car to the east and over to another track further east and from that point signalled to the engineer of the train to come on. He testified that from the time he left the south entrance to the chute and until he walked around this car and got to the place from where he could signal the engineer of the engine, it took him about five minutes. Thereupon the train commenced backing into the chute. The engine pushed the train through until the two cars in front had gone clear through the chute and across and north of Clinton street. The train then

stopped. The "hind man," who had been sent through the chute by the foreman, uncoupled the two forward cars, and the engine pulled the remainder of the train far enough back in and through the chute to leave some six cars in the chute, whereupon the engine and the car immediately in front of it were uncoupled from these cars and went away about other business, leaving the five or six cars inside of the chute. While the foreman was standing at the point on the eastern track from where he signalled the engineer, he could not see his "hind man," whom he had sent through to the north end of the elevator, nor could he see into the chute at all, because, as he says, the car that was on the track east of the elevator was close to the door, and he could not see through that to the elevator. No one was on the forward car of the train as it was pushed through. No one was at the entrance of the elevator after the foreman left to signal the engineer. No one preceded the train through the chute. The foreman left no one at the south end of the chute, so that for about five minutes, he testified, there was no one there at all, except the "hind man," who was at the north end opening the doors. Asked if there was any light on the first car that was backed in, he answered, "No." Counsel for appellant then objected to the question as immaterial, there being no allegation of negligence in that respect. The objection was overruled and exception duly saved. On cross-examination by counsel for defendant, the foreman testified that those cars were moved in very slowly. That was practically all the cross-examination to which the foreman was subjected.

It appears by the evidence that it was one of the duties of the deceased to stop at call boxes located throughout the elevator and which communicated electrically with an office of the elevator company, and call up that office and thus advise the operator there that the watchman was in attendance on his duties. The

deceased, if on duty, should have put in a call at 12:30 o'clock. Not receiving the call the operator went to the elevator and in company with one or more men, one of them also a night watchman there, and made a search for Mr. Peperkorn. After going through the elevator they finally found his body lying between the rails on the track which runs through the chute, and under one of the cars which had been pushed in that night. One of his legs was severed from the body and carried north some distance from it. Mr. Peperkorn was dead. There was blood on the ground near the body and on the truck or fore wheels of the first car of the train as it had been pushed through the chute, blood as well as a piece of jeans, corresponding to the clothing of the deceased, were found. No one saw the accident. No one had seen the deceased on the track, nor about the premises immediately before the train was pushed through, so far as appears by the evidence. His body was lying on its back and about sixty feet from the south end of the chute. A lantern, which was identified as having belonged to the deceased, was found on the floor of the elevator, that floor being raised about four feet above the tracks and on a level with the door sills of the cars. The lantern was lighted. No lantern or parts of one appear to have been found in the vicinity of the deceased, other than this, which was sitting on the main floor of the elevator, inside of the walls. The deceased had been in the employ of the elevator company some seventeen or eighteen years, going in and out of the passageway and about the elevator building, and was thoroughly familiar with the premises. Asked if deceased knew of the passage of cars in and out there, a witness, on cross-examination by defendant, answered: "He knew—that is when they would tell him, that they were going to push in cars, yes." The witness further said that in the course of his seventeen years of employment, deceased had seen cars standing on the tracks.

This same witness, a fellow watchman of deceased but not with him or apparently not in the vicinity at the time of the accident, testified that he did not know who had opened the doors of the elevator the night of this accident; that these doors were not allowed to stand open all the time and on the night of the accident they had been closed about eight o'clock, but he did not know who had opened them that night. In fact there is no evidence in the case as to who opened the south door; all the evidence as to this south door being that of the foreman, who, as noted, testified that when he reached there with the train, he found that door open.

This is a fairly full synopsis of the evidence in the case, so far as now pertinent. It was all introduced by plaintiff. At the close of it, plaintiff rested. Thereupon defendant offered an instruction in the nature of a demurrer; that being refused, defendant, standing on its demurrer, introduced no evidence.

The principal instruction in the case and the only one of which any complaint is now made, told the jury, substantially, that if they found that at the date of the accident, Peperkorn was engaged in the performance of his duties as a watchman on the premises of the Mississippi Valley Elevator & Grain Company, and in the chute or passageway, and if they further believed and found from the evidence that defendant, through its servants and agents at the time and place stated, "carelessly and negligently backed its aforesaid train of freight cars over the aforesaid track and into the aforesaid passageway, without having a man stationed on top of the cars or on or about the car at the end of the train farthest from the engine at the time the said train was being backed in as aforesaid, to give danger signals, *and without having the said train well manned with experienced brakemen at their posts so stationed as to see danger signals and hear signals from the engine,* and that the defendant company . . .

while operating the aforesaid locomotive and train of cars as aforesaid, . . . *gave no notice or warning to plaintiff's deceased husband of the approach of the said train of cars when it knew, or by the exercise of reasonable care would have known, the dangerous position of plaintiff's deceased husband,* but carelessly and negligently ran the said train and cars in the manner aforesaid upon and over plaintiff's said husband, thereby causing his death, and that plaintiff's deceased husband was at said time exercising reasonable care for his own safety, then your verdict will be for the plaintiff.''

The court further instructed the jury at the instance of plaintiff as to reasonable care and instructed them that if they found for plaintiff their verdict should be for not less than $2000 or more than $10,000.

At the instance of defendant the court gave an instruction, numbered 4, that if the deceased failed to exercise such care as an ordinarily careful and prudent man would have exercised under like or similar circumstances and such failure caused or contributed to cause his injuries, if any, their verdict should be for defendant.

Another instruction tol dthe jury that if they believed from the evidence that Peperkorn knew ''or by the exercise of ordinary care would have known, that the cars in question were about to be shoved in said loading chute,'' etc., plaintiff could not recover.

A further instruction, given at the instance of defendant, was to the effect that if the jury found that the foreman in charge of the crew sent his rear man through the loading shed for the purpose of complying with the city ordinance, ''and that said act in sending said man ahead was a substantial compliance with the ordinance, then your verdict must be for defendant.

Defendant's seventh instruction told the jury that the failure of defendant to comply with that ordinance;

if they found that it did fail, did not relieve the deceased of exercising ordinary care to look and listen for the approach of the cars in question.

Defendant's eighth instruction told the jury that the proceedings in the case are penal in nature and that their verdict would be a fine or penalty assessed against the defendant, "if you find from the evidence it is guilty of the negligence charged, and in this connection the court instructs you that you are in nowise to consider the question as to whether or not the plaintiff in this case has suffered any damage by reason of the death of her husband."

Defendant's ninth instruction told the jury that if they found from the evidence that the deceased while on the tracks in question, failed to look and listen for the approach of the cars in question and thereby caused or contributed to cause his injuries, their verdict should be for defendant.

The tenth instruction told the jury that if they found from the evidence that the deceased got on the tracks in question immediately in front of the cars and thereby caused or contributed to cause his injuries, their verdict must be for defendant.

These instructions, numbered seven, eight, nine and ten, were given exactly as asked by defendant. In other instructions asked by defendant the court substituted the word "would" in place of the word "could" and in another, calling attention to the knowledge of the danger by deceased, inserted the words, "or would have known with (while?) exercising ordinary care."

Of its own motion the court gave instructions defining ordinary care, telling the jury that the burthen of proof was on plaintiff to establish by the preponderance of the evidence the facts necessary to a verdict in her favor under the instructions given except upon the issue concerning the exercise of reasonable, ordi-

171 Mo. App.—46

nary care by the deceased. As to that issue, the jury being told that the burthen of proof was on defendant to show the want of such ordinary care or reasonable care on the part of plaintiff's husband. The court also defined the terms, "burden of proof" and "preponderance of evidence."

Defendant asked five instructions, all of which were refused. The only one, on the refusal of which error is now assigned, is this: "The court instructs you that you are not to decide this case upon speculation, conjecture or guess, and in this connection it instructs you that if you are unable to determine as to what was the cause of the death of John Peperkorn, if he be dead, except by conjecture, speculation or guess, then your verdict must be for defendant."

The errors here assigned are to the overruling of the demurrer to the evidence, it being contended, first, that that demurrer should have been sustained, because defendant's negligence as charged, that is, a failure to warn, was not the proximate cause of deceased's injuries, it conclusively appearing that the deceased knew of the presence and approach of the cars which it is alleged struck and killed him. It is further claimed under this assignment that plaintiff's cause of action is based upon what is commonly known as the "last chance doctrine" and an ordinance of the city of St. Louis. Repeating the particulars in which it was alleged the ordinance was disregarded or violated, counsel for appellant state that plaintiff abandoned the last chance doctrine and that the alleged violation of the ordinance was not supported by the evidence.

The second assignment of error to the overruling of the demurrer is that there is no causal connection established by the evidence between the deceased's death and defendant's alleged breach of the ordinance.

The third point of error, also pointing to the overruling of the demurrer, is the claim that the evi-

dence showed that the defendant had fully complied with the intent and purposes of the ordinance to the extent that the circumstances and conditions permitted.

The fourth assignment is the claim that the ordinance in question does not apply to the situation as disclosed by the record.

The fifth error assigned is to allowing the question, which we have before noted, as to whether there was any light on the first car backed in, to be asked.

The sixth point covers objections to the first instruction given at the instance of plaintiff. We have italicized the particular sentences of that instruction to which objection is made.

The final assignment is to the refusal of the court to give the instruction which we have quoted, to the effect that the case is not to be determined upon speculation, etc.

REYNOLDS, P. J. (after stating the facts).— This class of cases has been so frequently before our appellate courts that it would seem that the principles governing them and which should control in their determination have been so thoroughly discussed that an elaborate examination of the authorities is no longer necessary. Speaking broadly of the testimony in the case, it may be said of it that it was not subject to demurrer. It was sufficient to require a submission of the cause to the jury, and to sustain the verdict.

As observed by the learned counsel for appellant, counsel for respondent, while bringing the action in part on that, do not base their right to recover upon the last chance rule. They are right in this, for, from the evidence, neither that nor the humanitarian rule have a place in this case. Neither the crew of this train, nor, for that matter, anyone else, saw the deceased on the track at the time, nor saw the accident.

Counsel for appellant argue that the case is to be

determined on the construction and interpretation of city ordinance No. 22902. We have set out the substance of that ordinance, so far as here material.

This ordinance, it will be noted, provides that if any "cars or locomotives propelled by steam power be backing within said limits of the city, a man shall be stationed on top of the car at the end of the train farthest from the engine to give danger signals." That no such man was there in place is conceded. The argument of the learned counsel for appellant, however, on this point, is that the evidence shows that it was impracticable to have a man stand on the top of this car; that the space between the top of the car and the obstructions in the chute were so small that no man could stand there, and it is asserted that the evidence shows that a man could not go through the chute on top of the car unless he was lying flat on the top. We do not agree that this is borne out by the evidence. It is true that one witness testified that he laid down when he went through on one occasion; but this same witness said that one could not go through "without stooping." The inference that the jury had a right to draw from that was, that if he stooped he could go through in safety. The dimensions given, however, thirty-five inches between the running board on top of the car, which as we all know is the highest part of the car, and the arch or beam of the door, was thirty-five inches, and when the beam of the door was passed, and the car was inside of the door, the height was from forty-four to fifty-three and fifty-six inches. There is nothing whatever in this space or height to prevent any ordinary man, a man of any ordinary height and size, from sitting down and going through in safety, even if it was necessary to duck his head or stoop, immediately when passing under the beam. There was nothing to prevent him from sitting upright after that point was passed. All the argument and the cases cited by learned counsel for appellant,

to the effect that it was impracticable or unsafe to place a man in the position required by the ordinance upon the rear end of the front car, as for instance Baltimore & Ohio R. Co. v. Mali, 5 Atl. Rep. 87, l. c. 90, and Rafferty v. Missouri Pacific Ry. Co., 91 Mo. 33, 3 S. W. 393, are entirely inapplicable. It has further been said of this provision of the ordinance requiring a man to be on the rear end of the car which is being moved in front so that he can give danger signals, that it is not meant to construe it so closely and narrowly as to squeeze the life out of this humane regulation; that, broadly construed, the ordinance "contemplates that brakemen should be so located on a moving freight train in St. Louis that they can not only see and hear danger signals, but can give them to those whose duty it is to see and obey them." [Harper v. St. Louis Merchants Bridge Terminal Co., 187 Mo. 575, l. c. 587, 86 S. W. 99.]

Looking at the duty of this defendant in the instant case, suppose a man could not with safety stand or sit or even lie flat on the top of the car, there was not only nothing to prevent, but everything, under the circumstances, to require sending one ahead along the track, or even along the floor of the elevator. The cars were being pushed slowly through this chute at midnight; the chute so dark that the foreman did and could not distinguish persons even going through with a light; was not sure that he saw one or two people walking or just where they were. It was such a place as would naturally invite persons to walk there. Ordinary care, irrespective of the ordinance, as well as the spirit of that ordinance, demanded care and a lookout in backing a train through such a place.

Mindful of the danger to the wayfarer of moving a train propelled by steam power through any part of so densely populated a city as is St. Louis, this ordinance further provides that "no freight train shall at any time be moved within the city limits unless it

be well manned with experienced brakemen at their posts, who shall be so stationed as to see the danger signals and hear the signals from the engine.'' In the case at bar this train, so far as the evidence shows, was not manned at all. There is not a scintilla of evidence in the case to show that there was a brakeman, whether experienced or inexperienced, except the ''hind man,'' who was at least a hundred and eighty-five feet away from the south end of the chute when the train started through. The foreman was over a hundred and twenty-five feet off and out of sight of the chute. The engineer was the length of the cars, the tender and engine further away. No living human being is testified to have been anywhere in charge of or in communication with this train except the foreman, the engineer and the ''hind man.'' No one preceded this train as it was slowly backed or pushed through this blind passageway. There was no warning to notify anyone who might be on the track of the approaching train. The duty to have this train well manned, not only with a brakeman on the rear end of the forward car but, referring to this ''well manning'' clause of the ordinance, is clearly announced by our Supreme Court in Harper v. Terminal Company, supra.

Moreover, at the instance of appellant the court submitted to the jury, as a question of fact for their determination, if they found that the foreman, in sending his ''hind man'' through this shed or chute, did so for the purpose of complying with the city ordinance, to determine whether that was a substantial compliance with the city ordinance, and if they did find that it was, their verdict should be for defendant. We do not hold that this instruction should or should not have been given. All we do say of it is that having been given at its own instance, defendant has no ground of complaint and is concluded as to that by the verdict of the jury, the jury undoubtedly find-

ing that this act was not a substantial compliance with that provision of the ordinance.

Learned counsel for appellant argue, first, that there is no causal connection shown between the absence of all these precautions, which the ordinance of the city requires, the neglect to conform to the ordinance, and the death of this old man; second, those counsel suggest that he may have died of heart failure, or that he may have seen and did not heed the approaching train.

As to the first, we hold that there was ample evidence to prove that the cause of death was the failure to observe the ordinance.

There is nothing in the evidence to support the second suggestion; no evidence that the deceased had every had any trouble with his heart. That this old man was on the track when this train was being pushed through, is shown by the fact that his body was found under a car, on that track, between the rails; one leg severed from the body and carried a distance of some sixty feet from the place where the body rested and in the direction in which the train had been moved; blood was found around there; blood and shreds of clothing were found upon the forward trucks or wheels of the forward car which had been pushed through the chute. What stronger evidence could possibly be offered of the fact that this old man came to his death by having been struck and run over by this particular train? The evidence is that no other train had passed through there that night. That his death was caused by being run over by this particular train is beyond doubt. The law presumes in a case of that kind, that one had not committed suicide, and if there is any ground for presumption, it is directly against that of carelessness. Carelessness is usually contributory negligence and it is for the defendant to allege and the burden is on it to prove contributory negligence.

There was no ground for any speculation, conjec-

ture or guesswork in this case; no reason to suppose that the death occurred in any other way other than by means of this train. Hence the instruction, cautioning the jury against indulging in speculation, conjecture and guesswork, asked by appellant, was properly refused. That instruction as asked, instead of cutting off conjecture, would have thrown the door wide open for it. By its concluding sentence it would have set the jury to guessing and conjecturing for a cause, instead of confining them to the only known cause disclosed by the evidence. The old and leading case of Buesching v. St. Louis Gas Light Co., 73 Mo. 219, settles this proposition beyond controversy. There it is held that presumptions are not to be allowed in the face of known facts. The very able and exhaustive opinion in that case has been followed in every case since considered by our appellate courts in which that proposition has arisen. Counsel cites in support of that instruction, a late decision of the Kansas City Court of Appeals, Rogers v. Hammond Packing Co., 167 Mo. App. 49, 150 S. W. 558, point 3. An examination of that case and of the opinion shows very conclusively that it has no application whatever to the facts in the case at bar. Judge JOHNSON there quoted from Goransson v. Manufacturing Co., 186 Mo. 300, l. c. 307, 85 S. W. 338, to the effect that it is a rule of universal law that in suits of the character before the court, it is necessary for the plaintiff to allege and prove a causal connection between the injury and the negligence of the master. "The corollary of this rule," says the court, "is that if the accident might have resulted from more than one cause, for one of which the master is liable and for the other he is not liable, it is necessary for the plaintiff to prove, in the first instance, that the injury arose from the cause for which the master is liable; for it is not the province of a court or jury to speculate or guess from which cause the accident happened." No one will dispute that rule,

but it is not applicable to the facts in the case at bar. As we have before said, there was no room for speculation or conjecture or guesswork. There were no two causes here. In the presence of the known, visible facts, no room was left to court or jury to go hunting around for something else that might have been the cause of the accident.

Finally it is claimed, as to this ordinance, that it does not cover the place of this accident. That proposition is settled against this claim by the decision of our Supreme Court in Grube v. Missouri Pacific Ry. Co., 98 Mo. 330, l. c. 337, 11 S. W. 736, where Rafferty v. Missouri Pacific Ry. Co., 91 Mo. 33, 3 S. W. 393, relied on by appellant, is explained. [See, also, Merz v. Missouri Pacific Ry. Co., 88 Mo. 672; Prewitt v. Missouri, K. & T. Ry. Co., 134 Mo. 615, l. c. 626, 36 S. W. 667; and Jackson v. Kansas City, Ft. S. & M. R. Co., 157 Mo. 621, l. c. 633, 58 S. W. 32.] These are all cited by counsel for respondent in their brief. As counsel for appellant, in their reply brief, make no comment on this, we may assume that those learned gentlemen have abandoned the point. Whether they have or not, we hold against them on it.

We see no error in the clauses in the first instruction given at the instance of plaintiff which were pointed out by the learned counsel for appellant, and which we have italicized. They are, taken in connection with the body of the instruction, entirely correct.

Considering the instructions given on behalf of plaintiff and of the defendant, surely defendant has no cause whatever to complain. The court went to the very farthest limit under the law in giving defendant the benefit of every possible theory upon which, within the issues and the evidence, it could be asked by defendant.

The only assignment of error in the admission of the testimony is to overruling the objection to the question as to whether there was a light on the front of

the car as it went through this chute. That objection was made after the question had been asked and the answer given. That was too late. Counsel for appellant say that we should take notice of the fact that witnesses frequently answer so quickly that an objection cannot be interposed. We may know that happens, but we cannot assume that it occurred here. We must be governed by the record in the case and no such state of facts appear here.

A consideration of the case and of the authorities presented by the learned counsel for appellant leaves us no latitude whatever, gives us no ground whatever, upon which to sustain a reversal of this judgment. The trial was without any error materially affecting or prejudicing the rights of defendant, the verdict is not claimed to be excessive and, as we think, was for the right party.

The judgment of the circuit court is affirmed. *Nortoni* and *Allen, JJ.,* concur.